UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RONALD EICHMANN, | § | |
|     Plaintiff | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. C-05-574 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
|     Defendant | § | |

## MEMORANDUM AND RECOMMENDATION

Ronald Eichman filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security ("Commissioner") for the purpose of receiving Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff filed a motion for summary judgment on April 3, 2006 and defendant filed a motion for summary judgment on May 2, 2006 (D.E. 8, 10-1, 10-2).

## BACKGROUND

Plaintiff filed his applications on September 22, 2003 and they were denied at all administrative levels (Tr. 51-56, 50, 68-71, 8-17, 3-5). Plaintiff alleges an inability to work since July 15, 2003 because of a shoulder fracture, epilepsy and a mood disorder (Tr. 49-50, 91). His reported symptoms include limited arm movement, difficulty concentrating, chronic neck pain, fear of leaving the house and small seizures (Tr. 122, 133, 134, 136). Prior to the onset of his disability, he worked as a valve mechanic, pipefitter's helper, boilermaker, welder's helper, industrial painter and sandblaster helper and maintenance mechanic (Tr. 113).

## MEDICAL EVIDENCE

At least as early as March 15, 2002 plaintiff was diagnosed with hepatitis C and a seizure disorder for which he was prescribed Dilantin. It was also noted that he had a problem with alcohol abuse and he was advised to stop drinking (Tr. 167). In June 2002 it was noted that plaintiff had last had a seizure one and a half years previously and the doctor was going to check plaintiff's EEG before weaning him off of Dilantin (Tr. 166). In October 2002 plaintiff's EEG was normal and the doctor intended to wean him off of the Dilantin. The doctor again noted plaintiff's history of alcohol abuse (Tr. 163, 237).

In February 2003 plaintiff complained of neck pain and the doctor noted that he had torticollis[1] and a disc bulge at C5-6 and C6-7 but no neurological symptoms. Plaintiff had stopped taking Dilantin three months previously, but reported headaches, so the doctor restarted the medication (Tr. 162, 242).

On July 15, 2003 plaintiff had a grand mal seizure during which he dislocated both shoulders and fractured his right shoulder (Tr. 159). An x-ray of the right shoulder showed a fracture of the humeral head with a fragment displaced slightly inferiorly at the glenohumeral joints. The glenoid appeared intact (Tr. 232). On July 17, 2003 plaintiff's right shoulder was manipulated into a reduced position as confirmed by intraoperative image control (Tr. 144). A CT scan on August 5, 2003 showed a comminuted fracture dislocation of the right humeral head (Tr. 229). A chest x-ray in September 2003 showed no active disease in the chest, but moderate wedging of one of the lower dorsal vertebra (Tr. 228).

---

[1] Wryneck; a contracted state of the cervical muscles producing twisting of the neck and an unnatural position of the head. Dorland's Illustrated Medical Dictionary, 29th Ed.

Plaintiff underwent a psychiatric evaluation by psychiatrist Raul Capitaine, M.D., on January 27, 2004. He said he had been depressed for the previous six to eight months and was sleeping most of the time, trying to avoid being in pain. He was going to physical therapy in an effort to regain use of his shoulder. Surgery was risky for him because his platelet count was low. He reported small seizures two or three times per week followed by periods of disorientation. He had last had a grand mal seizure two months previously (Tr. 176). Plaintiff denied having a drinking problem and said he did not use any street drugs. He had drunk a beer the previous weekend and had been arrested for a DWI 15 years earlier (Tr. 177).

Plaintiff's appearance was unremarkable. His mood was dysphoric and his affect was congruent with his mood. He denied having suicidal thoughts. He became angry with bill collectors. Although he denied having hallucinations, he reported that when he is going to have a big seizure, he has flashbacks of things that happened in the past, his mind races and he is unable to concentrate. He cannot watch a movie because of lack of concentration. There was no evidence of delusional thinking (Tr. 177). Plaintiff's answers to questions were brief and pertinent and he was oriented to person, place and time. His long term memory was adequate but his recent memory with interference was poor. His immediate memory was average (Tr. 177-178). His concentration was fair and he could handle basic abstract ideas. His judgment was poor as measured by his ability to answer a hypothetical question. He had some insight, commenting that his main problem was his heath. His intellectual functioning was low average (Tr. 178).

Plaintiff reported that he bathed daily but did not help much around the house. During the day he went to doctor's appointments and physical therapy and watched television and slept.

His main social contacts were the girlfriend with whom he lived and the people he saw at physical therapy. He had some friends he did not see often and went to church a couple of times per year. His condition deteriorated after his last shoulder surgery. Plaintiff was able to concentrate, but was not persistent in doing routine tasks (Tr. 178).

Dr. Capitaine assessed plaintiff with a mood disorder with depressive features due to the seizure disorder and shoulder and neck pain. Plaintiff felt frustrated and worthless because he could not work and he was irritable and fatigued. In addition, he had the seizure disorder, hepatitis C and pain due to his neck and shoulder injuries. Dr. Capitaine assessed plaintiff with a GAF of 40$^2$.

Plaintiff was scheduled for shoulder surgery in March 2004. As part of the pre-operative evaluation, it was noted that he had last had a major seizure six months earlier but had last had a small seizure two weeks earlier (Tr. 216). Plaintiff underwent the surgery, described as a posterior arthrotomy, open reduction, scapular osteotomy and soft tissue repair on March 24, 2004 (Tr. 208-209). An x-ray on March 26, 2004 showed fixation pins in the humeral head and a questionable fracture of the greater tuberosity. The humeral head was projected high and immediately adjacent to the acromion. There was a questionable fracture involving the inferior portion of the glenoid (Tr. 201).

---

$^2$The Global Assessment of Functioning ("GAF") Scale considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. A GAF of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g. depressed man avoids friends, neglects family and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

An x-ray of plaintiff's neck on July 21, 2004 showed reversal of the normal cervical spine lordosis, probably secondary to muscle spasm. He had a mild diffuse disc bulge at the C5-6 level (Tr. 217). An x-ray of plaintiff's shoulder on August 18, 2004 showed no significant interval change in the previous right rotator cuff tear repair and no evidence of acute fracture or dislocation of the right shoulder (Tr. 245).

Plaintiff underwent an examination by Claudia Zimmerman, M.D., at a neurology clinic in October 2004. He reported six to seven events per day of sudden restlessness, diaphoresis, palpations and an impending feeling of loss of consciousness. There were no clear triggering factors. He was extremely scared and had been avoiding going out because of the events. He sometimes had shaking of the lower extremities and had developed a tremor in his upper extremities and brief myoclonic jerks in his tongue and upper and lower extremities. A prior EEG had been normal (Tr. 246).

On examination, plaintiff had obvious moderate psychomotor agitation with hyperactivity and frequent fluctuations on his tremor. He also had brief myoclonic-like movements in his upper extremities and intermittent facial tics. His speech sounded pressurized and he sighed throughout the exam. Plaintiff was coherent, but definitely agitated. His motor examination showed moderate to severe postural tremor in the upper right extremity with less on the left side and brief myoclonus in the upper extremities and paratonic rigidity in the upper extremities as well (Tr. 247). An EEG performed on November 3, 2004 was normal (Tr. 248).

### HEARING TESTIMONY

At the hearing on July 12, 2005, plaintiff, who was represented by counsel, testified that he was 44 years old and had last worked seven or eight years previously. He had begun working

at the age of 16 or 17.  His last job was working in the oil field as a valve mechanic for a well head company.  Prior to that, he had worked in construction (Tr. 24).

He has torticollis of the neck, hepatitis C, seizures and panic attacks.  Two years earlier he had a seizure and dislocated both shoulders and had surgery on the right shoulder.  He still is attending therapy for that shoulder.  He had to wait to have the surgery because of problems with his liver enzymes so he walked around for nine months with a fractured shoulder (Tr. 25).

He still is not able to use his right arm in a normal manner.  He has lost muscle mass in it and can raise it only to about chest level (Tr. 26-27).  He goes to physical therapy twice a week for an hour and 15 minutes each session in an effort to build muscle mass in his injured arm (Tr. 27, 34).  Also, his head is cocked to the right and has been that way for six or seven years and is becoming worse.  Some days it is worse than others, but it is like having a constant crick in his neck (Tr. 28).

He takes Dilantin and Tomapin for seizures and has been on seizure medication since he was 20 or 21 years old.  He has three bulging discs in his neck and a neurosurgeon recommended Botox injections, but he has to see his primary care physician for a referral to someone to administer the injections (Tr. 28).  He also has hepatitis C and thinks it causes him to be tired and depressed.  He does not take medication for it and does not know how he contracted it.

He last had a grand mal seizure two years earlier when he fell and dislocated both shoulders and fractured his right shoulder.  When he was in the emergency room his left shoulder popped back into place  (Tr. 29, 32-33).  He still has small seizures often, although he is not sure if they are seizures or panic attacks.  When they happen, he stares blankly and loses time (Tr. 29).  His neurologist thinks he is having small seizures, but the psychiatrist thinks they may be

panic attacks (Tr. 29-30). He was taking medication for seizures, but his doctor discontinued the medication because sometimes the medication causes seizures. Now the psychiatrist is trying to help him with talk therapy (Tr. 30). He first became depressed after he injured his shoulder and could no longer do things independently (Tr. 33). Plaintiff had an appointment in November 2005 with a doctor to discuss his neck problems (Tr. 30).

   Plaintiff thinks he could lift 10 pounds if he used both hands, but he could not lift it up very high. He does not think he could lift 10 pounds with just one hand. He could not lift 10 pounds off the ground for 2 hours and 45 minutes of an eight-hour work day. He cannot stand very long before he starts having problems with his legs. He does not have any problems with his hands or fingers. He can bend over and crouch, but it is difficult to stand back up again. When he turns his body, it hurts his neck and shoulder (Tr. 31).

   The pain in his neck is moderate and never goes away (Tr. 31). The pain in his shoulder is mild unless he tries to raise his arm too high. He could climb a six-foot ladder (Tr. 32). He could not reach up and lower a cast-iron skillet out of a kitchen cabinet (Tr. 35). He could place files in a cabinet as long as he did not have to reach above his chest (Tr. 35-36).

    He sees a doctor approximately every two weeks, in addition to his physical therapy sessions (Tr. 34-35). The medication he takes causes him to be tired, but he thinks the fatigue also might be caused by the depression (Tr. 36). He no longer drives because he is afraid he will have a seizure. He has had seizures while driving before and had a car accident and he is afraid he will kill himself or someone else (Tr. 36).

   Plaintiff does not think that he drinks heavily (Tr. 33). He has not attended Alcoholics Anonymous, but he now drinks only occasionally. In 2002 he was drinking up to a six-pack a

night, but he stopped drinking altogether approximately nine months before his shoulder surgery (Tr. 37-38).

The administrative law judge ("ALJ") presented a hypothetical question to the vocational expert ("VE"). He described a 42-year-old person with an 11th grade education with the same past work experience as plaintiff. He could lift and carry 20 pounds occasionally and 10 pounds frequently. He could occasionally climb, but could never balance, stoop, crouch or crawl. He could stand and walk six hours out of an eight-hour workday with normal breaks. He would have right shoulder limitations regarding continuous use of hand controls and he would have a limitation in reaching overhead with his right arm. He could occasionally reach overhead with his left arm, but he is right-handed. He could not climb a ladder, ropes or scaffolds, could not work at unprotected heights or around dangerous machinery and could not drive as a condition of employment. His work should be of a routine and repetitive nature rather than highly detailed or complex. He would need to work with things rather than with people and could not work with large groups of people (Tr. 42).

The VE testified that such a person could not do any of plaintiff's past relevant work because it was all medium to heavy in exertion. The VE testified that she would look at jobs that were light, unskilled, entry level, required a short demonstration and were routine. Using those criteria, she said plaintiff could do the work of a ticket taker, with 1,400 jobs in Texas and 98,000 in the national economy, or a parking attendant who did not actually drive the cars. There are 1,400 such jobs in Texas and 105,000 in the national economy (Tr. 42-43). He could also work as a packager, with 1,800 jobs in Texas and 200,000 in the national economy (Tr. 43).

If the person were limited to sitting six hours in an eight-hour workday with normal breaks and could lift a maximum of 10 pounds and still had the limitations of the first hypothetical, he could work in an optical goods type of job such as a polisher where he would be working at a bench. There are 1,400 polisher positions in Texas and 97,000 in the national economy (Tr. 43-44). He also could work as an addresser/labeler, which is a mail sorting type job but does not require overhead reaching. It is sedentary and unskilled and there are 1,700 jobs in Texas and more than 100,000 in the national economy. He could also work as a surveillance system monitor, with 3,000 positions in Texas and more than 154,000 in the national economy (Tr. 44-45).

If a person does not show up for work because of the side effects of medication, or because of physical therapy or doctor appointments, or because he felt tired and weak, he could not miss more than two days per month on a regular basis without being at risk of losing his job (Tr. 45). Also, if a person needed unscheduled breaks and needed more than the normal number of breaks in a work day he probably would be terminated (Tr. 46). Plaintiff did not think he would be able to work at even an easy job because of his appointments with the doctor and the physical therapist which would cause him to miss work four days per week (Tr. 47).

## LEGAL STANDARDS

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.;

Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).  The burden has been described as more than a scintilla, but lower than a preponderance.  Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" Johnson v. Bowen, 864 F.2d 340, 344 (5th Cir. 1988)(citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present.  But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994)(citations omitted).  It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors:  (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history.  Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work.  Martinez v. Chater, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step.  Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994).

**DISCUSSION**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his onset date of July 15, 2003 (Tr. 11-12).  The ALJ further found that plaintiff had severe impairments, namely fractures of an upper limb, a mood disorder and epilepsy, but that the impairments did not meet or equal the criteria of any listed impairments (Tr. 12).  The ALJ further determined that plaintiff could not return to his past relevant work because of the heavy lifting involved (Id.).  The ALJ found that plaintiff has the residual functional capacity ("RFC") to do a significant range of sedentary work and could do the work of an optical goods polisher, addresser/labeler and security systems monitor (Tr. 14-15, 17)[3].  Accordingly, the ALJ found plaintiff not disabled (Tr. 16-17).

Plaintiff objects to these findings and argues that the ALJ's decision is not supported by substantial evidence.  Specifically, plaintiff argues that the ALJ did not properly consider plaintiff's torticollis and whether it is a severe impairment.  In addition, plaintiff argues that the ALJ did not consider whether the torticollis meets or equals the criteria for a listed impairment.  The defendant counters that even in light of a diagnosis of torticollis, the record supports the ALJ's finding that plaintiff can do a modified range of sedentary work.

**A.  Severity of Impairment**

At step two of the evaluation process, the Social Security regulations provide the following:

---

[3]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  20 C.F.R. § 416.967(a).

> If you do not have a severe impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment, and are, therefore, not disabled. We will not consider your age, education and work experience.

20 C.F.R. §§ 404.1520(c), 416.920(c).  This regulation was interpreted by the Fifth Circuit in Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985).  "'[A]n impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Stone (citing Estran v. Heckler, 745 F.2d 340 (5th Cir. 1984)). A finding of "non-severity" cannot be made on medical evidence alone, but must be based on whether the evidence necessarily determines the individual's ability to work.  Id. at 1103.

The court in Stone was very specific regarding the standard that should be used to determine the severity of an impairment:

> [W]e will in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(c)(1984) is used.  Unless the correct standard is used, the claim must be remanded to the Secretary for reconsideration.

Id. at 1106.  Plaintiff argues that the ALJ found that plaintiff's neck problems were not severe, but failed to cite the Stone standards, which requires a remand.

However, rulings after Stone have narrowed the holding to require remand only when the ALJ failed to cite the Stone standard and the case was adjudicated at the second step of the evaluation process.  See Chaparro v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987)(when case does not turn on issue of whether impairment is severe, remand under Stone is not called for). Because in plaintiff's case the ALJ did not decide the case at the second step of the sequential process, but at the fifth-step, remand is not required.

**B.  Listed Impairment**

Plaintiff argues that the ALJ did not properly consider whether the torticollis met or equaled a listed impairment because he disregarded the evidence of torticollis in the record.  If a social security claimant has an impairment that meets the 12-month duration requirement and is listed in appendix 1 of the social security regulations or is equal to a listed impairment, she will be found disabled without considering her age, education or work experience.  20 C.F.R. § 404.1520(d).  The only listings for musculoskeletal impairments that could include plaintiff's torticollis would be § 1.02, Major dysfunction of a joint or § 1.04, Disorders of the spine.

Section 1.02 provides the following:

*Major dysfunction of a joint(s)(due to any cause):* Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint(s).
With:
A.  Involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
or
B.  Involvement of one major peripheral joint in each upper extremity (i.e. shoulder, elbow, or wrist-hand) resulting in inability to perform fine and gross movements effectively as described in 1.00B2c.

It is clear that plaintiff's neck problems alone do not meet the requirements of this listing.  To the extent that he is arguing that the combination of his shoulder and neck problems equal the listing, his argument fails because only one of his arms is impaired and the listing requires that both be impaired to such an extent that the person is unable to perform fine and gross movements.  Accordingly, plaintiff's impairments do not meet or equal the criteria for major dysfunction of a joint.

Section 1.04 provides the following, in relevant part:

13

> *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
> or . . . .

There is no evidence in plaintiff's of compromise or compression of a nerve root in plaintiff's case. Therefore, he does not meet the listing for disorders of the spine, or any other musculoskeletal impairment.

## C.  Residual Functional Capacity and Hypothetical Question

Plaintiff briefly mentioned the fact that the ALJ in his decision did not cite to the testimony of the VE that if a person were to miss more than two days of work per month because of doctor or physical therapy appointments he would not be able to maintain employment. However, plaintiff did not make the argument that, based on the testimony, he could not do any type of work. Plaintiff testified that he was going to physical therapy twice a week and that he spent additional days at medical appointments. If true, he would not be able to maintain employment, according to the testimony of the VE. Nevertheless, because there was no documentation regarding his twice-weekly visits to therapy or other frequent doctor visits, and because plaintiff did not make this particular argument, there is an insufficient basis on which to order a remand of plaintiff's case.

## RECOMMENDATION

The Commissioner's determination that plaintiff is not disabled is supported by substantial evidence. It is respectfully recommended that plaintiff's motion for summary

judgment (D.E. 8) be denied, and the Commissioner's motion for summary judgment (D.E. 10) be granted. The Commissioner's determination that plaintiff is not disabled should be affirmed.

Respectfully submitted this 30th day of June, 2006.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **TEN (10) DAYS** of receipt of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)-(C) and Article IV, General Order No. 80-5, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within TEN (10) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415 (5th Cir. 1996) (en banc).